**IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION**

| | | |
|---|---|---|
| **RONALD PAIRAN on Behalf of Himself And All Others Similarly Situated,** | ) | **Case No. 1:20-cv-17** |
| | ) | |
| | ) | **Judge** |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | |
| **GUARDIAN PROTECTION SERVICES OF OHIO, LLC and GUARDIAN PROTECTION SERVICES, INC.** | ) | |
| | ) | |
| | ) | **CLASS-ACTION COMPLAINT FOR** |
| | ) | **INJUNCTIVE RELIEF WITH JURY** |
| **Defendants.** | ) | **DEMAND** |
| | ) | |

Plaintiff Ronald Pairan for his complaint against Defendants, alleges as follows:

## I.     STATEMENT OF THE CASE

1.     Mr. Pairan worked for Defendants Guardian Protection Services of Ohio, LLC, a subsidiary of Guardian Protections Services, Inc. (collectively referred to as "Guardian" or "Defendants") installing residential and small-business alarm systems almost 20 years before he was terminated without cause only weeks before Christmas 2018.

2.     During his tenure, Defendants classified Mr. Pairan as an independent contractor even though the economic reality was one of an employer-employee relationship.

3.     On June 29, 2016, Mr. Pairan's supervisor said his work schedule was being reduced because a compliance officer advised the Defendants it could not classify its technicians as independent contractors if they worked four or five days per week.  Instead of advising Mr. Pairan that he might be entitled to overtime pay from years prior, Defendants waited for the statute of limitations to expire before telling him his services were no longer needed.

4.      This Complaint comes as a request for the Court to apply the equitable tolling doctrine so that Mr. Pairan, and others similarly situated, can recover unpaid overtime compensation, liquidated damages, statutory penalties, and other damages pursuant to FLSA § 216(b) and Fed. R. Civ. P. 23.

## II.      PARTIES

5.      Plaintiff Ronald Pairan is a resident of the State of Ohio, and putative class members are those similarly situated persons who file consent forms with the Court, pursuant to 29 U.S.C § 216(b), and who may be certified by the Court pursuant to Fed. R. Civ. P. 23.

6.      Defendants Guardian Protection Services is a for-profit limited liability corporation registered in the State of Ohio, with its statutory agent listed at P.O. Box 1342, Lebanon Ohio 45036.  Defendants has offices within the jurisdiction of this Court at 9852 Windisch Road, Cincinnati, Ohio, and is engaged at that place of business in the sale, installation, and monitoring of residential and commercial security and home automation systems.

## III.      JURISDICTION AND VENUE

7.      This is an action for monetary damages, declaratory relief, injunctive relief, and all other equitable and ancillary relief brought pursuant to the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 201 *et seq*., the Ohio Fair Wage Standards Act ("OFWSA"), Ohio Revised Code ("R.C.") §§ 4111.01, *et seq*., and R.C. § 2913.01 *et seq*.

8.      This Court has jurisdiction over the federal claims pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1337, and FLSA Section 16(c), and the Court has supplemental jurisdiction over the state-law claims pursuant to 28 U.S.C. § 1367.

9.      Defendants managed and controlled Plaintiff's work, and the work of other similarly situated technicians, including the amount of overtime required to be worked out of Defendants' Cincinnati, Ohio office, as well as out of other locations throughout the country.

10.     Defendants acted and continues to act as an "employer" as defined by the FLSA.

11.     Defendants is, and was at all times relevant to this action, engaged in the performance of related activities for a common business purpose, constituting an enterprise within the meaning of Section 3(r) of the FLSA.

12.     Upon information and belief, the enterprise described in Paragraph 10 is, and was at all times relevant to this action, an enterprise engaged in commerce or in the production of goods for commerce within the meaning of Section 3(s)(1)(A) of the FLSA, with an annual dollar volume in excess of $500,000.00 exclusive of excise taxes at the retail level, and with employees engaged in commerce including employees handling, selling, or otherwise working on goods or materials that have been produced for or moved in commerce.

13.     Plaintiff brings this action, pursuant to 29 U.S.C. § 216(b), on his own behalf and on behalf of other similarly situated past and present technicians employed by the Defendants anywhere in the United States.

## IV.    FACTUAL ALLEGATIONS

14.     Defendants Guardian Protection Services sells, installs, and monitors residential and commercial security and home automation systems.

15.     Plaintiff and putative class members have been or are currently employed by Defendants as alarm system technicians.

16.     In April 2000, Defendants hired Plaintiff Ronald Pairan as a technician and assigned him employee identification number 990.

17.    Throughout his tenure, Mr. Pairan used his employee ID number whenever he interacted with the Defendants' corporate office, Cincinnati office, or the Defendants' 24-hour central-monitoring station.

18.    Mr. Pairan attended approximately 25 to 30 mandatory training sessions while employed by Guardian.

19.    Training sessions lasted one to two hours unpaid, and Operations Manager Shane McVey told Mr. Pairan that if he did not attend he would not know how to install new products and therefore would not be assigned any work.

20.    Mr. Pairan also served as on-the-job training instructor for new hires, sometimes for months at a time.  The operations manager did not permit new hires to work on their own until Mr. Pairan certified them as ready to do so.

21.    Mr. Pairan began each workday at Defendants' 9852 Windisch Road location, where he received his daily assignments from Operations Manager McVey, and where the warehouse manager provided the equipment needed to complete those assignments.

22.    Defendants instructed Plaintiff and putative class members to arrive at Defendants' 9852 Windisch Road location between 7:00 and 7:30 a.m.

23.    The operations manager reprimanded anyone who arrived after 7:30 a.m. and would refuse to assign a late arriver any work for that day, even if there was work available.

24.    At the start of his tenure, Mr. Pairan wore a company uniform to which he was required to affix a company identification badge.

25.    At no time did Mr. Pairan own or operate an independent business.

26.    Mr. Pairan drove a personal vehicle to whatever job site Guardian assigned him.

27.     Guardian required Mr. Pairan to carry a $1,000,000 insurance policy on his vehicle, and to list Guardian as an additional insured, but Guardian refused to share in the cost of the policy and refused to pay mileage reimbursements.

28.     The alarm systems Mr. Pairan installed and maintained remain an integral part of Defendants' business.

29.     Mr. Pairan earned the confidence of his employer such that Guardian regularly sent him to install alarm systems for company "friends and family."

30.     Mr. Pairan earned the confidence of his customers such that they regularly requested him by name and called the corporate office to commend his work.

31.     Guardian representatives, including Sales Representative Albert Henry, told Mr. Pairan not to tell customers that he was an independent contractor.

32.     Mr. Pairan was paid weekly by way of a corporate check from Guardian's parent corporation the Armstrong Group of Companies.

33.     When Mr. Pairan requested direct deposit, Mickey Hayes in Defendants' accounts payable department said he was like a bill that periodically came due and refused the request.

34.     Mr. Pairan had no opportunities for profit or loss.

35.     Mr. Pairan's earnings were based on the number of assignments he completed and the number of products and services he sold to each customer ("piecework").

36.     At no time during his tenure did Mr. Pairan solicit or obtain assignments except through Guardian.

37.     At no time during his tenure was Mr. Pairan permitted to set or negotiate the price or cost of the products or services he sold.

38. At no time during his tenure was Mr. Pairan permitted to set or negotiate his share of the profits from the products or services he sold.

39. If Mr. Pairan arrived at a job site to find the assignment was cancelled, referred to as a "blowout," Guardian paid him a $40 "trip charge."

40. Mr. Pairan worked six days per week for the first 10 years, from 2000 until 2010, when Guardian granted his request to work five days so as to have more time with his wife and their young daughter.

41. Circa August 7, 2015, Guardian told Mr. Pairan he still needed to wear a company identification badge, but that he no longer needed to wear a company uniform, and that the company was reducing his work schedule to four days per week.

42. On June 29, 2016, Operations Manager McVey advised Mr. Pairan that Guardian had hired a compliance officer who told the company it could not classify him, or others similarly situated, as independent contractors while also working them four or five days per week.

43. When Mr. Pairan objected to having his schedule reduced to three days per week, Operations Manager McVey said Guardian would schedule him five days per week if he and his brother started a business because then Guardian would be making payments to a business instead of to an individual.

44. Instead of reclassifying Mr. Pairan and his colleagues as employees, Guardian reduced their work schedules to three days per week, and required that they obtain a fire license, liability insurance, and umbrella insurance coverage. All else remained the same.

45. Instead of advising Mr. Pairan that he might be entitled to unpaid overtime from years prior, Guardian waited two years before telling Mr. Pairan his services were no longer needed.

46.     Operations Manager McVey said the company felt its employees were "dragging their feet," and that Plaintiff and putative class members must begin recording the start time and end time for each job because the company wanted to compare the productivity and efficiency of its employees with the productivity and efficiency of its independent contractors.

47.     Prior to that new directive, Mr. Pairan maintained his own records regarding, among other items, his start times, end times, miles traveled and other expenses incurred.

48.     At termination, Mr. Pairan was told Guardian had a new president who did not want independent contractors coming face-to-face with customers.

49.     Upon information and belief, Defendants still classifies technicians as independent contractors to pre-wire a site during the building phase.   Once the build is complete, the independent contractor is replaced by an employee who interfaces with the customer.

50.     From 2000 to 2018, Guardian distributed to Plaintiff and putative class members several training manuals that were different only to the extent that newer manuals included information regarding new equipment and services.

51.     Circa August 2016, Guardian introduced an "upselling" initiative whereby technicians could earn a non-negotiable 10 percent commission on the sale of each product or service not requested in an initial work order.

52.     Guardian required Mr. Pairan to carry a list of upsell items and their prices, and Guardian held competitions within and between its branch locations as to who could upsell the most equipment and services.

53.     Mr. Pairan was not in competition with other technicians for work assignments. Guardian assigned work unilaterally and of its own accord.

54. If Mr. Pairan told the Defendants he was unable to work due to illness, the common response was that there was no one else, and that Mr. Pairan was required to take the assignment.

55. If Mr. Pairan or his coworkers nonetheless refused an assignment, for a period of days or weeks the assigning official would withhold work from whoever refused.

56. If an assignment was problematic, or if an assignment might take all day, Plaintiff and putative class members were required to contact Operations Manager Shane McVey to "keep [him] in the loop."

57. In August 2016, Defendants continued to use a training manual that told Mr. Pairan he had joined the Guardian family and would be the face of the company.[1]

58. The training manual provides detailed explanations for how work is to be performed, even how a company truck is to be parked at a job site.[2]

59. The only difference between Mr. Pairan and the technicians Guardian classified as employees[3] is that (1) Mr. Pairan was permitted to go home if his daily assignments were completed earlier than expected, whereas the employees were assigned to an additional job site; and (2) employees were required to take a one hour unpaid lunchbreak whether or not the employee in fact stopped working.

60. At no point in time was Mr. Pairan an independent contractor.

61. Nonetheless, Defendants caused Mr. Pairan to believe he was an independent contractor when in fact he was an employee.

62. By misclassifying Mr. Pairan and other technicians as independent contractors, Defendants deceived them and deprived them of statutory protections and overtime pay.

---

[1] *See* Exhibit A: Technician Resource Manual.
[2] *See* Exhibit A, p. 384.
[3] Referred to by Defendants as "hourly."

8

63.     By misclassifying Mr. Pairan and other technicians as independent contractors, Defendants cheated state and federal government out of payroll taxes, income taxes, workers' compensation insurance contributions, unemployment insurance contributions, as well as contributions to Social Security and Medicare programs.

64.     And by cheating state and federal government out of taxes and contributions, Defendants disadvantaged its competitors who obey the law.

65.     Guardian knew it was misclassifying Mr. Pairan, but instead of reclassifying him and paying him the overtime to which he was entitled, Guardian waited for the statute of limitations to toll before terminating his employment.

66.     Guardian did not post, or keep posted, in conspicuous places a notice explaining Plaintiff's rights under FLSA.

67.     Guardian kept Mr. Pairan employed throughout FLSA's two-year statutory limitations period to prevent him from discovering his claims until after the limitations period expired.

68.     Due to Defendants' acts and omissions, Mr. Pairan did not discover his legal claims against Guardian until January 20, 2019 when he retained an attorney in connection with Guardian's termination of his employment.

## V.     CLASS ALLEGATIONS

69.     Plaintiff Ronald Pairan brings this action, on behalf of himself and all others similarly situated, pursuant to 29 U.S.C. § 216(b) and Rule 23 of the Federal Rules of Civil Procedure.  Plaintiff seeks to represent the following class:

All technicians who have worked for Defendants installing and maintaining alarm systems since January 1, 2013.

70.     Specifically, this action is brought under Rule 23(a)(1)-(a)(4) and Rule 23(b)(1)(2).

**A. The Putative Class Satisfies Rule 23(a) in That It Is Impracticable to Join Hundreds of People All of Whom Might Be Entitled to Unpaid Overtime.**

71.     Members of the putative class are so numerous that joinder is impracticable. Defendants employs approximately 785 people, an unknown number of whom work as technicians installing and maintaining alarm systems.

72.     The relief sought is common to all putative members of the class in that all seek monetary damages suffered directly or indirectly as a result of Defendants misclassifying them as independent contractors.

73.     This action involves common questions of law and fact that predominate over questions affecting individual class members:

a.  Do the services Plaintiff and putative class members rendered constitute an integral part of Defendants' business?

b.  Was the relationship between the parties a permanent one?

c.  Did Plaintiff and putative class members invest their own money in facilities and or equipment?

d.  To what extent did Defendants control the work performed by Plaintiff and putative class members?

e.  To what extent did Plaintiff and putative class members have opportunities for profit and loss?

f.  To what extent was Plaintiff's and putative class members' success determined by the amount of initiative, judgement, or foresight exercised in open-market competition with others?

g.  Did Plaintiff or putative class members own or operate an independent business?

h.  Did Plaintiff or putative class members work in excess of 40 hours per week?

i.  Did Defendants advise Plaintiff or putative class members that they might be entitled to overtime pay?

74. Predominant questions of law common to the class also include, among others, whether persons who install and maintain alarm systems on a piecework basis are covered by FLSA, OFWSA, and other applicable state laws.

75. Predominant questions of fact common to the class include, among others, whether Defendants denied its alarm-system technicians overtime compensation for hours worked in excess of 40 in each week; whether wages paid to technicians failed to meet FLSA, OFWSA, or other state minimum wage requirements; and whether technicians were paid for time spent travelling to and from each job site.

76. The named Plaintiff's claims are typical of the putative class members' claims in that those claims arise from the same course of conduct, namely the Defendants' misclassification of its employees to avoid overtime pay, payroll taxes, income taxes, workers' compensation insurance contributions, unemployment insurance contributions, and contributions to Social Security and Medicare programs.

77. The named Plaintiff adequately represents the putative class in that all share the same interest in being compensated for unpaid overtime work.

78. The named Plaintiff is well trained with respect to Defendants' policies and procedures and is prepared to respond to discovery requests.

79. The named Plaintiff is committed to fulfilling the role and duties of a class representative who seeks to protect the statutory rights of those similarly situated.

80. The named Plaintiff and the putative class are represented by Cook & Logothetis, LLC. Affidavits from Plaintiffs' counsel describing their qualifications will be submitted with the motion for class certification.

81.     The named Plaintiffs and their attorneys will fairly and adequately protect the interests of the putative class.

**B.  The Putative Class Satisfies Rule 23(b)(1) in that Litigating Separate Actions by Individual Class Members Would Be Dispositive of the Interests of All Other Class Members.**

82.     The putative class satisfies Rule 23(b)(1)(B) in that the answer to the common questions of law and fact listed above will be dispositive as to whether Plaintiffs possess the rights they seek to enforce by way of this action, and whether the Defendants' acts and omissions violated the rights Plaintiffs seek to enforce by way of this action.

**C.  The Putative Class Satisfies Rule 23(b)(2) in that the Defendants' Misclassification of its Technicians is Applicable to the Entire Class.**

83.     Class action is appropriate in that the Defendants acted, and refused to act, on grounds applicable to the class by misclassifying them as independent contractors when in fact they were employees.

84.     Class action is appropriate in that the injunctive and declaratory relief sought for each claim would be applicable and appropriate to the class as a whole.

## VI.     CLAIMS FOR RELIEF

85.     Requiring Plaintiff to work in excess of forty hours per week without overtime compensation violates the provisions of the Federal Fair Labor Standards Act, 29 U.S.C. §201, *et seq.*, specifically § 207(a)(1), Ohio Revised Code § 4111.03, as well as the provisions of state laws covering putative class members.  As a result of this unlawful practice, Plaintiff and putative class members have suffered, and continue to suffer, a loss of wages and benefits.

86.     Upon information and belief, there are additional persons entitled to notice of this action and their right to opt-in to this lawsuit.

**CLAIM I**
**Failure to Post A Notice Explaining FLSA**
**29 C.F.R. § 516.4**

Plaintiff incorporates the allegations of Paragraphs 1 through 86 as if fully set forth herein.

87.     "Every employer employing any employees subject to the [FLSA's] minimum wage provisions shall post and keep posted a notice explaining the Act… in conspicuous places in every establishment where such employees are employed so as to permit them to observe readily a copy."[4]

88.     Defendants failed to post, and or failed to keep posted, in conspicuous places a notice explaining Plaintiff's rights under FLSA in violation of 29 C.F.R. § 516.4.

89.     Defendants' failure to post a notice explaining Plaintiff's rights under FLSA constitutes wrongful conduct that prevented Plaintiff from discovering his legal claims against Guardian, and that prevented Plaintiff from filing a complaint against Guardian within FLSA's two-year statute of limitations.

**CLAIM II**
**Equitable Tolling**

Plaintiff incorporates the allegations of Paragraphs 1 through 89 as if fully set forth herein.

90.     The equitable tolling doctrine permits courts to extend statutes of limitations on a case-by-case basis to prevent inequity.[5]

91.     "Th[e] equitable tolling doctrine is read into every federal statute, including the FLSA."[6]

---

[4] 29 C.F.R. § 516.4.
[5] *See Truitt v. Cnty. Of Wayne*, 148 F.3d 644 (6th Cir. 1998).
[6] *Stransky v. HealthOne of Denver, Inc.*, 868 F.Supp.2d 1178, 1181 (D. Colo. 2012)

13

92.    "Courts have equitably tolled statutes of limitations in FLSA actions when doing so is in the interest of justice."[7]

93.    Thus, equitable tolling is available when a plaintiff was prevented from asserting his claims by some wrongful conduct on the part of a Defendants.[8]

94.    For example, where an employer fails to post the required FLSA notice pursuant to 29 C.F.R. § 516.4, the statute of limitations is tolled until the employee obtains an attorney or obtains actual knowledge of his or her rights.[9]

95.    Defendants failed to post, and or failed to keep posted, in conspicuous places a notice explaining Plaintiff's rights under FLSA.

96.    By failing to post the required notice in conspicuous places, Defendants hid from Mr. Pairan that he was entitled to overtime pay for hours worked in excess of 40 per week for at least the two years prior to June 2016.

97.    Defendants caused Mr. Pairan to believe he was an independent contractor, when in fact he was an employee, to avoid the duty to pay overtime, payroll taxes, income taxes, workers' compensation insurance contributions, unemployment insurance contributions, as well as to avoid the duty to make contributions to Social Security and Medicare programs.

---

[7] *Id.* (citing *Partlow v. Jewish Orphans' Home, Inc*., 645 F.2d 757, 760-61 (9th Cir. 1981) (equitable tolling proper where plaintiffs were without fault and "practical effect of not tolling the statute would be to bar forever any claim" the employees had against Defendants), abrogated on other grounds by *Hoffmann-La Roche, Inc. v. Sperling*, 493 U.S. 165, 110 S. Ct. 482, 107 L. Ed. 2d 480 (1989).
[8] *Cruz v. Maypa*, 773 F.3d 138, 146 (4th Cir.2014).
[9] *See e.g.*, *Cruz*, 773 F.3d at 147 (4th Cir. 2014) ("[A]bsent a tolling rule, employers would have no incentive to post notice since they could hide the fact of their violations from employees until any relevant claims expired. For all of these reasons, this Court's analysis in [ADEA claims] applies with equal force to the notice requirement of the FLSA.").

98.     Deceiving Plaintiff into believing he was an independent contractor, failing to post FLSA-required notices, and keeping Plaintiff employed until just after the two-year statute of limitations expires constitutes "wrongful conduct" on the part of the Defendants.

99.     Because Defendants deceived Plaintiff into believing he was an independent contractor not entitled to overtime, because Defendants failed to post the required notice regarding Plaintiff's rights under FLSA, because Defendants changed his work schedule so as to deceive various state and federal agencies, and because Defendants kept Plaintiff employed for two years after changing his work schedule, Plaintiff had no knowledge of his rights under FLSA until January 20, 2019 when he retained an attorney.

100.    Because Defendants deceived Plaintiff into believing he was not entitled to overtime, because Defendants failed to post the required notice regarding Plaintiff's rights under FLSA, because Defendants changed his work schedule so as to deceive various state and federal agencies, and because Defendants kept Plaintiff employed for two years after changing his work schedule, Plaintiff should be relieved from the statutory duty to file a claim against Defendants within two years after the cause of action accrued.

101.    Because Defendants deceived Plaintiff into believing he was not entitled to overtime, because Defendants failed to post the required notice regarding Plaintiff's rights under FLSA, because Defendants changed his work schedule so as to deceive various state and federal agencies, and because Defendants kept Plaintiff employed for two years after changing his work schedule, in the interest of justice this Court should apply the equitable tolling doctrine and permit Plaintiff to pursue his claims.

**CLAIM III**
**Willful Misclassification**
**Fair Labor Standards Act**
**29 U.S.C. § 201 *et seq.***

Plaintiff incorporates the allegations of Paragraphs 1 through 101 as if fully set forth herein.

102.    Plaintiff worked as an alarm system technician at Guardian's 9852 Windisch Road, Cincinnati, Ohio location from April 2000 to December 2018.

103.    The primary duties of all technicians are to sell, install, and maintain commercial and or residential alarm systems based on work order assignments provided by their supervisors or dispatchers.

104.    At hiring, Mr. Pairan was assigned an employee ID number, which he used whenever interacting with the Defendants' corporate office, Cincinnati office, or the Defendants' 24-hour central-monitoring station.

105.    Mr. Pairan attended unpaid mandatory training sessions that lasted one to two hours, and Mr. Pairan was told if he did not attend, he would not know how to install new products and therefore would not be assigned any work.

106.    Mr. Pairan began each day at Defendants' 9852 Windisch Road, West Chester Township location where he would receive his daily work assignments and pick up the equipment needed to complete those assignments.

107.    At no time during his tenure did Mr. Pairan solicit or obtain assignments except through Guardian.

108.    At the start of his tenure, Mr. Pairan wore a company uniform to which he was required to affix a company identification badge.

109.    Mr. Pairan drove a personal vehicle to whatever job site Guardian assigned him, Guardian required Mr. Pairan to carry a $1,000,000 insurance policy on that vehicle and to list Guardian as an additional insured.

110.    The alarm systems Mr. Pairan installed and maintained remain an integral part of Defendants' business.

111.    At no time did Mr. Pairan own or operate an independent business.

112.    On August 7, 2014, Guardian told Mr. Pairan he still needed to wear a company identification badge, but that he no longer needed to wear a company uniform, and that the company was reducing his work schedule to four days per week.

113.    Mr. Pairan had no opportunities for profit or loss.

114.    Mr. Pairan's earnings were based on the number of assignments he completed and the number of products and services he sold to each customer.

115.    At no time during his tenure was Mr. Pairan permitted to set or negotiate the price or cost of the products or services he sold.

116.    At no time during his tenure was Mr. Pairan permitted to set or negotiate his share of the profits from the products or services he sold.

117.    Mr. Pairan was not in competition with other technicians for work assignments. Guardian assigned work unilaterally and of its own accord.

118.    If Mr. Pairan or his coworkers nonetheless refused an assignment, for a period of days or weeks the assigning official would withhold work from whoever refused.

119.    Guardian representatives, including Sales Representative Albert Henry, told Mr. Pairan not to tell customers that he was an independent contractor.

120.    The only difference between Mr. Pairan and the technicians Guardian classified as employees is that (1) Mr. Pairan was permitted to go home if his daily assignments were completed earlier than expected, whereas the employees were assigned to an additional job site; and (2)

employees were required to take a one hour unpaid lunchbreak whether or not the employee in fact stopped working.

121.     On June 29, 2016, Operations Manager Shane McVey advised Mr. Pairan that Guardian had hired a compliance officer who told the company it could not classify him, or others similarly situated, as independent contractors while also working them four or five days per week.

122.     Instead of reclassifying Mr. Pairan and his colleagues, Guardian reduced their work schedules to three days per week, and required that they obtain a fire license, liability insurance, and umbrella insurance coverage.  All else remained the same.

123.     And instead of advising Mr. Pairan and his colleagues that they might be entitled to unpaid overtime from years prior, Guardian waited two years before telling Mr. Pairan his services were no longer needed.

124.     Defendants knowingly and intentionally misclassified Plaintiff and putative class members, and has failed and continues to fail to pay overtime wages and other benefits to them despite the fact that it required Plaintiff and putative class members to work in excess of 40 hours per week, and despite the fact that alarm system technicians are not exempt from the FLSA.

125.     Although Defendants classified Plaintiff and putative class members as independent contractors, it maintained time and attendance records as well as a record of company inventory in Plaintiff's possession, and exercised a right to control the means and manner by which Plaintiff's work was performed, evincing the economic reality of an employer-employee relationship.

**CLAIM IV**
**Failure to Pay Overtime**
**Fair Labor Standards Act**
**29 U.S.C. § 201 *et seq*.**

Plaintiff incorporates the allegations of Paragraphs 1 through 125 as if fully set forth herein.

126.    For the first 10 years of his employment with Guardian, Plaintiff worked six days per week installing and maintaining commercial and residential alarm systems.

127.    Mr. Pairan's earnings were not based on hourly wages but instead based on the number of assignments he completed, and the number of products and services he sold to each customer.

128.    Nonetheless, Guardian maintained time and attendance records consistent with, and typical of, an employer-employee relationship.

129.    Until circa June 29, 2016, Plaintiff Pairan, as well as putative class members, regularly worked in excess of forty hours per week, including evenings and weekends.

130.    During the first five months of 2014, Plaintiff worked approximately 97.89 overtime hours.[10]

131.    During the first six months of 2015 Plaintiff worked approximately 123.39 overtime hours.[11]

132.    When Plaintiff and putative class members received a paycheck, the check amounts did not accurately reflect the amount of time worked, traveled, or spent completing assignments.

133.    Defendants' foregoing actions were willfully undertaken in bad faith and in violation of the Fair Labor Standards Act, 29 U.S.C. § 201, *et seq*.

134.    Defendants is liable to Plaintiff and putative class members for actual damages, liquidated damages, and equitable relief pursuant to 29 U.S.C. § 216(b).

**CLAIM V**
**Failure to Pay Overtime**
**Ohio Fair Wage Standards Act**
**R.C. § 4111.01, *et seq*.**

---

[10] *See* Exhibit B: "Overtime Hours Worked: January 1 to May 31, 2014."
[11] *See* Exhibit C: "Overtime Hours Worked: January 1 to July 1, 2015."

Plaintiff incorporates the allegations of Paragraphs 1 through 134 as if fully set forth herein.

135.    Defendants' foregoing acts and omissions constitute violations of the OFWSA, codified at Chapter 4111 of the Ohio Revised Code.

136.    Defendants is liable to Plaintiffs for actual damages, liquidated damages, and equitable relief, including costs and attorney's fees, pursuant to O.R.C. §§ 4111.10 and 4111.14.

**CLAIM VI**
**Theft and Fraud**
**R.C. § 2913.01 *et seq*.**

Plaintiff incorporates the allegations of Paragraphs 1 through 136 as if fully set forth herein.

137.    Defendants caused Mr. Pairan to believe he was an independent contractor not entitled to overtime, when in fact he was an employee, to avoid the duty to pay overtime, payroll taxes, income taxes, workers' compensation insurance contributions, unemployment insurance contributions, as well as the duty to make contributions to Social Security and Medicare programs.

138.    By deceiving Plaintiff into believing he was an independent contractor not entitled to overtime pay, by changing his work schedule so as to deceive various state and federal agencies, and by keeping Plaintiff employed for two years after changing his work schedule, Defendants knowingly obtained, by deception, a financial benefit for itself, and caused financial detriment to Plaintiff, in violation of Ohio Revised Code § 2913.01 *et seq*.

139.    Because Defendants knowingly obtained, by deception, a financial benefit for itself and caused financial detriment to another, Plaintiff is entitled to compensatory damages and punitive damages pursuant to R.C. § 2315.21.

**VII.    PRAYER FOR RELIEF**

Plaintiff Ronald Pairan, individually and on behalf of all others similarly situated, seeks judgment against Defendants Guardian Protective Services for a sum that will properly and

completely compensate Plaintiff and putative class members for the nature, extent, and duration of their damages, the costs of this action, as well as the following relief:

140.    An order for Defendants to file with this Court, and furnish to counsel, a list of the names, mailing addresses, and email addresses of all alarm-system technicians who currently work for Defendants, and who have worked for Defendants since January 1, 2013;

141.    Authorize Plaintiff's counsel to issue notice at the earliest possible time to all current and former technicians employed by the Defendants since January 1, 2013 informing them that this action has been filed, describing the nature of the action, and advising them of their right to opt-in to this lawsuit if they worked in excess of forty hours per week during the liability period and were not paid overtime compensation or minimum wage as required by FLSA, OFWSA, or by any other state-law equivalent;

142.    Declare and find that the Defendants committed one or more of the following acts:

   i.    Willfully violated overtime and or minimum wage provisions of the FLSA by failing to pay overtime and or minimum wages to Plaintiff and similarly situated persons who opt-in to this action; and

   ii.   Willfully violated overtime provisions of the Ohio Fair Wage Standards Act, O.R.C. §4111.01, *et seq*. by failing to pay overtime and or minimum wages to Plaintiff and similarly situated persons.

143.    Certify this Complaint as a collective action, pursuant to 29 U.S.C. § 216(b) and O.R.C. § 4111.14, on behalf of all technicians employed by Guardian in the State of Ohio, and anywhere else in the United States, since January 1, 2013.

144.    Certify this action as a class action pursuant to Fed. R. Civ. P. 23(b)(3) on behalf of all alarm-system technicians employed by Guardian in the State of Ohio, and anywhere else in the United States, since January 1, 2013;

145.    Award compensatory damages including all overtime and or minimum-wage compensation owed, in an amount according to proof, for the three years prior to the date Defendants hired the compliance officer mentioned above in paragraph 42;

146.    Award interest on all overtime and or minimum wage compensation due, to accrue from the date such amounts came due;

147.    Award compensatory damages for all work-related insurance premiums paid by Plaintiff and putative class members;

148.    Award the value of paid time off, 401(k) contributions, truck use, tools, laptops, per diem, and gas cards provided to "hourly" employees.

149.    Award as liquidated damages an amount equal to the total of those amounts reflected in paragraphs 145 through 148 above;

150.    Award all costs and attorney's fees incurred in the prosecution of these claims;

151.    Grant Plaintiff leave to amend his Complaint to add claims under applicable state laws;

152.    Grant leave to add additional Plaintiffs by motion, the filing of written consent forms, or any other method approved by the Court; and

153.    For such further relief as the Court deems just and equitable.

Respectfully Submitted,


s/ Bennett P. Allen
Bennett P. Allen (96031)
COOK & LOGOTHETIS, LLC

30 Garfield Place, Suite 540
Cincinnati, OH 45202
P: (513) 287-6992
F: (513) 721-1178
ballen@econjustice.com
*Trial Attorney for Plaintiff*

David M. Cook (23469)
COOK & LOGOTHETIS, LLC
30 Garfield Place, Suite 540
Cincinnati, OH 45202
P: (513) 287-6980
F: (513) 721-1178
dcook@econjustice.com
*Attorney for Plaintiff*

## **JURY DEMAND**

Plaintiffs request trial by jury as permitted under the Federal Rules of Civil Procedure upon all issues so triable to a jury.

s/ Bennett P. Allen
Bennett P. Allen